**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JASON RATNER, derivatively on behalf of THE BOEING COMPANY, | Case No.: |
| Plaintiff, | |
| v. | <u>DEMAND FOR JURY TRIAL</u> |
| W. JAMES MCNERNEY, JR., DENNIS A. MUILENBURG, GREGORY D. SMITH; DAVID L. CALHOUN, ARTHUR D. COLLINS, JR., LINDA Z. COOK, KENNETH M. DUBERSTEIN, EDMUND P. GIAMBASTIANI, JR., LYNN J. GOOD, LAWRENCE W. KELLNER, EDWARD M. LIDDY, SUSAN C. SCHWAB, RONALD A. WILLIAMS, and MIKE S. ZAFIROVSKI, | |
| Defendants, | |
| -and- | |
| THE BOEING COMPANY, | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff, Jason Ratner ("Plaintiff"), brings this shareholder derivative action on behalf of Nominal Defendant The Boeing Company ("Boeing" or the "Company") and against certain current and former officers and directors of the Company for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duties, unjust enrichment, corporate waste, and insider selling. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Boeing and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on Boeing's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from the related pending securities fraud class action, *Bisht v. The Boeing Company et al.*, Case No. 1:16-cv-02454 (N.D. Ill.) (the "Securities Class Action"); and (e) review of other publicly available information concerning Boeing and the Individual Defendants (defined below).

## NATURE AND SUMMARY OF THE ACTION

1.     Boeing is the world's largest aerospace company and a leading manufacturer of commercial jetliners and defense, space and security systems.

2.     Boeing is organized into two business units: Commercial Airplanes and Defense, Space & Security. Supporting these units are Boeing Capital Corporation, Shared Services Group, and Boeing Engineering, Operations & Technology.

3.     Since at least February 9, 2012 through the present (the "Relevant Period"), the Individual Defendants caused the Company to issue false and misleading statements concerning

the Company's financial and business prospects, including false and misleading statements regarding the costs and expected sales of certain types of aircraft.

4.    The Company has been a leading manufacturer of commercial jetliners for decades, and currently manufactures the 737, 747, 767, 777, and 787 families of airplanes, including the 787 Dreamliner and the 747 jumbo aircraft.

5.    Since 2003, the Company's Commercial Airplanes unit has used the "program accounting" method, through which the Company divides the costs of producing a unit over an entire jetliner program rather than attributing such costs to the particular unit. This method allows Boeing to average out the costs and anticipated profits for a specific aircraft over the duration of the "program," a period which can last for decades and can include hundreds or thousands of aircraft.

6.    During the Relevant Period, the Individual Defendants made and caused the Company to make materially false and misleading statements regarding the Company's business, operations, and financial prospects. Specifically, defendants made or caused the Company to make false and/or misleading statements and/or failed to disclose that: (i) Boeing's use of program accounting for the Company's 787 Dreamliner and/or 747 jumbo aircraft relied on inflated sales forecasts; (ii) the Company's use of program accounting for the Company's 787 Dreamliner and/or 747 jumbo aircraft relied on understated estimates of production costs; and (iii) as a result of the foregoing, Boeing's public statements were materially false and misleading at all relevant times.

7.    On February 11, 2016, *Bloomberg News* reported that the SEC is investigating whether Boeing properly accounted for the costs and expected sales of the Company's 787 Dreamliner and 747 jumbo aircraft. According to the article:

> Underlying the SEC review is a financial reporting method known as program accounting that allows Boeing to spread the enormous upfront costs of

manufacturing planes over many years. While the SEC has broadly blessed its use in the aerospace industry, critics have said the system can give too much leeway to smooth earnings and obscure potential losses.

*        *        *

As part of the investigation, SEC enforcement attorneys are examining whether Boeing's financial statements relied on sales forecasts that might be too optimistic, one person said. Another avenue of inquiry is whether Boeing's estimates for declining production costs will come to fruition, the person said.

A whistleblower has given SEC officials internal documents and data about Boeing's accounting, according to the people. The tipster first raised concerns with the regulator more than a year ago, one person said. SEC policy is to not reveal the identities of whistleblowers.

8.       As a result of the Individual Defendants' conduct, Boeing's common stock traded at artificially inflated levels during the Relevant Period. On the news of the SEC's investigation into Boeing, investors sold Boeing stock, causing the Company's stock price to fall $7.92 per share to close at $108.44 per share on February 11, 2016, the Company's lowest stock price in more than two years, erasing billions of dollars in market capitalization.

9.       Boeing's Board of Directors (the "Board") has not, and will not commence litigation against the Individual Defendants named in this complaint, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to Boeing for authorizing or failing to correct the false and misleading statements alleged herein and for failing to correct and/or implement the necessary internal controls to prevent the harm to the Company that has occurred. Accordingly, a pre-suit demand upon the Board is a useless and futile act. Thus, Plaintiff rightfully brings this action to vindicate Boeing's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to Boeing.

## JURISDICTION AND VENUE

10.       The Court has jurisdiction over all claims under 28 U.S.C. § 1331 in that the Complaint states a federal question. The Court has supplemental jurisdiction over the state law

claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

11.     The Court has jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in Illinois, or is an individual who has sufficient minimum contacts with Illinois so as to render the exercise of jurisdiction by the Illinois courts permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because many of the acts and practices complained of herein occurred in this District.

13.     In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## THE PARTIES

### A.    Plaintiff

14.     Plaintiff is, and at all relevant times has been, a holder of Boeing common stock.

### B.    Nominal Defendant

15.     Nominal Defendant Boeing is incorporated in Delaware, and the Company's principal executive offices are located at 100 North Riverside, Chicago, Illinois 60606.  The Company's common stock is traded on the New York Stock Exchange under the ticker symbol "BA."  The Company has more than 660 million shares outstanding.

### C.    Individual Defendants

16.     W. James McNerney, Jr. ("McNerney") was the Chairman of the Board from July 2005 to March 1, 2016, and was a director of the Company from 2001 to March 1, 2016. McNerney was also the President of the Company from July 2005 to December 2013, and was

the Chief Executive Officer ("CEO") of the Company from July 2005 to July 1, 2015. McNerney is a defendant in the Securities Class Action. He received $23,263,562 in total compensation from Boeing in 2013, $28,861,920 in total compensation from Boeing in 2014, and $19,916,946 in total compensation from Boeing in 2015. During the Relevant Period, McNerney was also a member of the Special Programs Committee. During the Relevant Period, while in possession of material, non-public information, McNerney sold at least 307,227 personally held shares of Boeing stock at artificially inflated prices for proceeds of more than $43 million.

17.     Dennis A. Muilenburg ("Muilenburg") has been Boeing's President since December 2013, and CEO since July 2015. Muilenburg has also been a director since 2015, and became the Chairman of the Board on March 1, 2016. Muilenburg was the Company's Vice Chairman and Chief Operating Officer from December 2013 to July 2015. During the Relevant Period, Muilenburg was also the chair of the Special Programs Committee. Muilenburg is a defendant in the Securities Class Action. Muilenburg received $7,721,612 in total compensation from Boeing in 2013, $11,798,401 in total compensation from Boeing in 2014, and $13,226,333 in total compensation from Boeing in 2015. During the Relevant Period, while in possession of material, non-public information, Muilenburg sold at least 40,659 personally held shares of Boeing stock at artificially inflated prices for proceeds of approximately $5.74 million.

18.     Gregory D. Smith ("Smith") has served as the Chief Financial Officer ("CFO") of the Company since February 2012. Smith is a defendant in the Securities Class Action. Smith received $3,596,012 in total compensation from Boeing in 2013, $10,579,551 in total compensation from Boeing in 2014, and $4,819,815 in total compensation from Boeing in 2015. During the Relevant Period, while in possession of material, non-public information, Smith sold

at least 9,589 personally held shares of Boeing stock at artificially inflated prices for proceeds of more than $1.2 million.

19.     David L. Calhoun ("Calhoun") has been a director of the Company since February 2009.  During the Relevant Period, Calhoun was a member of the Compensation Committee and the Governance, Organization and Nominating Committee.  Calhoun received $301,500 in total compensation from Boeing in 2013, $301,000 in total compensation from Boeing in 2014, and $326,000 in total compensation from Boeing in 2015.

20.     Arthur D. Collins, Jr. ("Collins") has been a director of the Company since 2007. During the Relevant Period, Collins was the chair of the Compensation Committee and was both a member of and the chair of the Governance, Organization and Nominating Committee.  Collins received $316,500 in total compensation from Boeing in 2013, $316,500 in total compensation from Boeing in 2014, and $346,000 in total compensation from Boeing in 2015.

21.     Linda Z. Cook ("Cook") was a director of the Company from 2003 until in or about April 2015.  During the Relevant Period, Cook was a member of the Audit Committee and the chair of the Finance Committee.  Cook received $306,500 in total compensation from Boeing in 2013, $295,500 in total compensation from Boeing in 2014, and $166,000 in total compensation from Boeing in 2015.

22.     Kenneth M. Duberstein ("Duberstein") has been a director of the Company since 1997.  During the Relevant Period, Duberstein was a member of the Compensation Committee and the chair of the Governance, Organization and Nominating Committee.  Duberstein received $341,500 in total compensation from Boeing in 2013, $341,500 in total compensation from Boeing in 2014, and $371,000 in total compensation from Boeing in 2015.  During the Relevant Period, while in possession of material, non-public information, Duberstein sold at least 2,400

personally held shares of Boeing stock at artificially inflated prices for proceeds of approximately $312,000.

23. Admiral Edmund P. Giambastiani, Jr. ("Giambastiani") has been a director of the Company since 2009. During the Relevant Period, Giambastiani was a member of the Audit Committee, the Finance Committee, and the Special Programs Committee. Giambastiani received $275,750 in total compensation from Boeing in 2013, $276,000 in total compensation from Boeing in 2014, and $302,550 in total compensation from Boeing in 2015.

24. Lynn J. Good ("Good") has been a director of the Company since 2015. During the Relevant Period, Good was a member of the Audit Committee and the Finance Committee. Good received $145,969 in total compensation from Boeing in 2015

25. Lawrence W. Kellner ("Kellner") has been a director of the Company since 2011. During the Relevant Period, Kellner was a member of the Audit Committee and the chair of the Finance Committee. Kellner received $301,500 in total compensation from Boeing in 2013, $301,500 in total compensation from Boeing in 2014, and $336,172 in total compensation from Boeing in 2015.

26. Edward M. Liddy ("Liddy") has been a director of the Company since 2010. During the Relevant Period, Liddy was a member of the Finance Committee and the chair of the Audit Committee. Liddy received $292,500 in total compensation from Boeing in 2013, $300,000 in total compensation from Boeing in 2014, and $320,000 in total compensation from Boeing in 2015.

27. Susan C. Schwab ("Schwab") has been a director of the Company since 2010. During the Relevant Period, Schwab was a member of the Audit Committee and the Finance Committee. Schwab received $287,500 in total compensation from Boeing in 2013, $291,800 in

total compensation from Boeing in 2014, and $318,000 in total compensation from Boeing in 2015.

28.     Ronald A. Williams ("Williams") has been a director of the Company since 2010. During the Relevant Period, Williams was a member of the Compensation Committee, the Special Programs Committee, and the Governance, Organization and Nominating Committee. Williams received $301,500 in total compensation from Boeing in 2013, $301,000 in total compensation from Boeing in 2014, and $326,000 in total compensation from Boeing in 2015.

29.     Mike S. Zafirovski ("Zafirovski") has been a director of the Company since 2004. During the Relevant Period, Zafirovski was a member of the Compensation Committee and the Governance, Organization and Nominating Committee. Zafirovski received $301,500 in total compensation from Boeing in 2013, $301,500 in total compensation from Boeing in 2014, and $326,000 in total compensation from Boeing in 2015.

**D.     Non-Party**

30.     Randall L. Stephenson ("Stephenson") is not a defendant in this action. He was appointed to serve on Boeing's Board of Directors effective February 17, 2016 to replace McNerney. Stephenson serves on the Audit Committee, Finance Committee, and Special Programs Committee.

31.     Defendants identified in ¶¶ 16-29 are sometimes referred to herein as the "Individual Defendants."

32.     Defendants identified in ¶¶ 17 and 19-29 are sometimes referred to herein as the "Director Defendants."

33.     Defendants identified in ¶¶ 21 and 23-27 are sometimes referred to herein as the "Audit Committee Defendants."

34. Defendants identified in ¶¶ 16-18 and 22 are sometimes referred to herein as the "Insider Selling Defendants."

## FACTUAL ALLEGATIONS

35. Boeing is the world's largest aerospace company and a leading manufacturer of commercial jetliners and defense, space, and security systems.

36. Boeing, together with its subsidiaries, designs, develops, manufactures, sells, services, and supports commercial jetliners, military aircraft, satellites, missile defense, human space flight, and launch systems and services worldwide. The Company's segments include: Commercial Airplanes, Boeing Military Aircraft, Network & Space Systems, Global Services & Support, and Boeing Capital.

37. Boeing was first incorporated in Seattle, Washington in 1916 by William Boeing, and was later reincorporated in Delaware in 1934.

38. The Company has been a leading manufacturer of commercial jetliners for decades, and currently manufactures the 737, 747, 767, 777, and 787 families of airplanes, including the 787 Dreamliner and 747 jumbo aircraft.

39. Since 2003, the Company's Commercial Airplanes unit has used the "program accounting" method, through which the Company divides the costs of producing a unit over an entire jetliner program, rather than attributing such costs to the particular unit. This method allows Boeing to average out the costs and anticipated profits for a specific aircraft over the duration of the "program," a period which can last for decades and can include hundreds or thousands of aircraft.

40. On February 9, 2012, the Individual Defendants caused Boeing to file an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2011. For 2011, Boeing reported net income of

$4.02 billion, or $5.34 per diluted share, on revenue of $68.74 billion, compared to net income in 2010 of $3.31 billion, or $4.45 per diluted share, on revenue of $64.31 billion.  The 2011 Form 10-K stated in part:

**Program Accounting**

Program accounting requires the demonstrated ability to reliably estimate the relationship of sales to costs for the defined program accounting quantity.  A program consists of the estimated number of units (accounting quantity) of a product to be produced in a continuing, long-term production effort for delivery under existing and anticipated contracts.  The determination of the accounting quantity is limited by the ability to make reasonably dependable estimates of the revenue and cost of existing and anticipated contracts.  For each program, the amount reported as cost of sales is determined by applying the estimated cost of sales percentage for the total remaining program to the amount of sales recognized for airplanes delivered and accepted by the customer.

Factors that must be estimated include program accounting quantity, sales price, labor and employee benefit costs, material costs, procured part costs, major component costs, overhead costs, program tooling and other non-recurring costs, and routine warranty costs. . . .

***To ensure reliability in our estimates, we employ a rigorous estimating process that is reviewed and updated on a quarterly basis.***  Changes in estimates are normally recognized on a prospective basis; when estimated costs to complete a program exceed estimated revenues from undelivered units in the accounting quantity, a loss provision is recorded in the current period for the estimated loss on all undelivered units in the accounting quantity.

The program method of accounting allocates tooling and other non-recurring and production costs over the accounting quantity for each program.  Because of the higher unit production costs experienced at the beginning of a new program and substantial investment required for initial tooling and other non-recurring costs, new commercial aircraft programs, such as the 787 program, typically have lower margins than established programs.

Due to the significance of judgment in the estimation process described above, it is likely that materially different cost of sales amounts could be recorded if we used different assumptions, or if the underlying circumstances were to change.  Changes in underlying assumptions/estimates, supplier performance, or other circumstances may adversely or positively affect financial performance in future periods.  If combined cost of sales percentages for commercial airplane programs, excluding the 747 and 787 programs, for all of 2011 had been estimated to be higher or lower by 1%, it would have increased or decreased pre-tax income for the year by approximately $276 million.

10

The 747 program is in a reach-forward loss position having recorded a total of $2,037 million of reach-forward losses in 2009 and 2008. Absent changes in the estimated revenues or costs, subsequent deliveries are recorded at zero margin. Reductions to the estimated loss in subsequent periods are spread over all undelivered units in the accounting quantity, whereas increases to the estimated loss are recorded immediately. Any such increases could result in additional charges.

The 787 program has a low single digit profit margin. The cumulative impacts of the production challenges, schedule delays and customer and supplier impacts continue to place significant pressure on revenues, costs and the profitability of the 787 program. The scale and duration of the 787 program is such that relatively minor changes in assumptions or variables could have a material effect on our reported results in any period if the program is determined to have a reach-forward loss.[1]

41. Boeing's 2011 Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants McNerney and Smith, stating that the financial information contained in the 2011 Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting. In addition to McNerney and Smith, the 2011 Form 10-K was signed by, among others, Director Defendants Calhoun, Collins, Duberstein, Giambastiani, Kellner, Liddy, Schwab, Williams, and Zafirovski. Defendant Cook also signed the 2011 Form 10-K.

42. On February 9, 2012, the Company's stock price closed at $69.02.

43. On March 16, 2012, Boeing filed a Proxy Statement pursuant to Section 14(a) of the Exchange Act ("2012 Proxy").[2] The 2012 Proxy described director responsibilities, the duties of each committee, Board risk management, and provided information about the director nominees up for election. However, the 2012 Proxy misrepresented and/or failed to disclose that: (i) Boeing's use of program accounting for the Company's 787 Dreamliner and/or 747 jumbo aircraft relied on inflated sales forecasts; (ii) the Company's use of program accounting

---

[1] Unless otherwise noted, where emphasis appears in quoted material in this Complaint, it has been added by Plaintiff.

[2] The 2012 Proxy included Boeing's 2011 Annual Report, which included a copy of Boeing's 2011 Annual Report on Form 10-K.

for the 787 Dreamliner and/or 747 jumbo aircraft relied on understated estimates of production costs; and (iii) as a result of the foregoing, Boeing's public statements were materially false and misleading at all relevant times.

44.     On April 25, 2012, the Individual Defendants caused Boeing to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2012.  For the quarter, Boeing reported net income of $923 million, or $1.22 per diluted share, on revenue of $19.38 billion, compared to net income of $586 million, or $0.78 per diluted share, on revenue of $14.91 billion for the same period in the prior year. The Form 10-Q stated in part:

**Commercial Aircraft Programs**

At March 31, 2012 and December 31, 2011, commercial aircraft programs inventory included the following amounts related to the 787 program: $17,727 and $16,098 of work in process (including deferred production costs of $11,949 and $10,753), $1,827 and $1,770 of supplier advances, and $1,997 and $1,914 of unamortized tooling and other non-recurring costs.[3]  At March 31, 2012, $9,744 of 787 deferred production costs, unamortized tooling and other non-recurring costs are expected to be recovered from units included in the program accounting quantity that have firm orders and $4,202 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

At March 31, 2012 and December 31, 2011, commercial aircraft programs inventory included the following amounts related to the 747 program: $736 and $448 of deferred production costs, net of previously recorded reach-forward losses, and $805 and $852 of unamortized tooling.  At March 31, 2012, $1,045 of 747 deferred production costs, unamortized tooling and other non-recurring costs are expected to be recovered from units included in the program accounting quantity that have firm orders and $496 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

45.     The Form 10-Q for the first quarter of 2012 contained signed certifications pursuant to SOX by defendants McNerney and Smith, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

---

[3]  All dollar figures in the quotations from the Company's quarterly reports are in millions.

46.     On July 25, 2012, the Individual Defendants caused Boeing to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2012.  For the quarter, Boeing reported net income of $967 million, or $1.27 per diluted share, on revenue of $20.01 billion, compared to net income of $941 million, or $1.25 per diluted share, on revenue of $16.54 billion for the same period in the prior year.  The Form 10-Q stated in part:

**Commercial Aircraft Programs**

At June 30, 2012 and December 31, 2011, commercial aircraft programs inventory included the following amounts related to the 787 program: $19,494 and $16,098 of work in process (including deferred production costs of $13,184 and $10,753), $1,852 and $1,770 of supplier advances, and $2,145 and $1,914 of unamortized tooling and other non-recurring costs.  At June 30, 2012, $10,925 of 787 deferred production costs, unamortized tooling and other non-recurring costs are expected to be recovered from units included in the program accounting quantity that have firm orders and $4,404 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

At June 30, 2012 and December 31, 2011, commercial aircraft programs inventory included the following amounts related to the 747 program: $765 and $448 of deferred production costs, net of previously recorded reach-forward losses, and $778 and $852 of unamortized tooling.  At June 30, 2012, $916 of 747 deferred production costs and unamortized tooling costs are expected to be recovered from units included in the program accounting quantity that have firm orders and $627 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

47.     The Form 10-Q for the second quarter of 2012 contained signed certifications pursuant to SOX by defendants McNerney and Smith, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

48.     On October 24, 2012, the Individual Defendants caused Boeing to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2012.  For the quarter, Boeing reported net income of $1.03 billion, or $1.35 per diluted share, on revenue of $20.01 billion, compared to net income of

$1.1 billion, or $1.46 per diluted share, on revenue of $17.73 billion for the same period in the prior year. The Form 10-Q stated in part:

**Commercial Aircraft Programs**

At September 30, 2012 and December 31, 2011, commercial aircraft programs inventory included the following amounts related to the 787 program: $20,728 and $16,098 of work in process (including deferred production costs of $14,275 and $10,753), $1,862 and $1,770 of supplier advances, and $2,229 and $1,914 of unamortized tooling and other non-recurring costs. At September 30, 2012, $11,387 of 787 deferred production costs, unamortized tooling and other non-recurring costs are expected to be recovered from units included in the program accounting quantity that have firm orders and $5,117 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

At September 30, 2012 and December 31, 2011, commercial aircraft programs inventory included the following amounts related to the 747 program: $1,018 and $448 of deferred production costs, net of previously recorded reach-forward losses, and $737 and $852 of unamortized tooling. At September 30, 2012, $1,067 of 747 deferred production costs and unamortized tooling costs are expected to be recovered from units included in the program accounting quantity that have firm orders and $688 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

49.    The Form 10-Q for the third quarter of 2012 contained signed certifications pursuant to SOX by defendants McNerney and Smith, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

50.    On February 11, 2013, the Individual Defendants caused Boeing to file an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2012. For 2012, Boeing reported net income of $3.9 billion, or $5.11 per diluted share, on revenue of $81.70 billion. The 2012 Form 10-K stated in part:

**Program Accounting**

Program accounting requires the demonstrated ability to reliably estimate the relationship of sales to costs for the defined program accounting quantity. A

14

program consists of the estimated number of units (accounting quantity) of a product to be produced in a continuing, long-term production effort for delivery under existing and anticipated contracts. The determination of the accounting quantity is limited by the ability to make reasonably dependable estimates of the revenue and cost of existing and anticipated contracts. For each program, the amount reported as cost of sales is determined by applying the estimated cost of sales percentage for the total remaining program to the amount of sales recognized for airplanes delivered and accepted by the customer.

Factors that must be estimated include program accounting quantity, sales price, labor and employee benefit costs, material costs, procured part costs, major component costs, overhead costs, program tooling and other non-recurring costs, and routine warranty costs. . . .

***To ensure reliability in our estimates, we employ a rigorous estimating process that is reviewed and updated on a quarterly basis.*** Changes in estimates are normally recognized on a prospective basis; when estimated costs to complete a program exceed estimated revenues from undelivered units in the accounting quantity, a loss provision is recorded in the current period for the estimated loss on all undelivered units in the accounting quantity.

The program method of accounting allocates tooling and other non-recurring and production costs over the accounting quantity for each program. Because of the higher unit production costs experienced at the beginning of a new program and substantial investment required for initial tooling and other non-recurring costs, new commercial aircraft programs, such as the 787 program, typically have lower margins than established programs.

Due to the significance of judgment in the estimation process described above, it is likely that materially different cost of sales amounts could be recorded if we used different assumptions, or if the underlying circumstances were to change. Changes in underlying assumptions/estimates, supplier performance, or other circumstances may adversely or positively affect financial performance in future periods. If combined cost of sales percentages for commercial airplane programs for all of 2012 had been estimated to be lower by 1%, it would have increased pre-tax income for the year by approximately $420 million. If the combined cost of sales percentages for commercial airplane programs for all of 2012 (excluding the 747 and 787 programs which have gross margins that are breakeven or near breakeven at December 31, 2012) had been estimated to be higher by 1%, it would have decreased pre-tax income for the year by approximately $324 million. If we are unable to mitigate risks associated with the 747 and 787 programs, or if we are required to change one or more of our pricing, cost or other assumptions related to these programs, we could be required to record reach forward losses which could have a material effect on our reported results.

51.     The 2012 Form 10-K contained signed certifications pursuant to SOX by defendants McNerney and Smith, stating that the financial information contained in the 2012

Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting. In addition to McNerney and Smith, the 2012 Form 10-K was signed by, among others, Director Defendants Calhoun, Collins, Duberstein, Giambastiani, Kellner, Liddy, Schwab, Williams, and Zafirovski. Defendant Cook also signed the 2012 Form 10-K.

52. On March 15, 2013, Boeing filed a Proxy Statement pursuant to Section 14(a) of the Exchange Act ("2013 Proxy").[4] The 2013 Proxy described director responsibilities, the duties of each committee, Board risk management, and provided information about the director nominees up for election. However, the 2013 Proxy misrepresented and/or failed to disclose that: (i) Boeing's use of program accounting for the Company's 787 Dreamliner and/or 747 jumbo aircraft relied on inflated sales forecasts; (ii) the Company's use of program accounting for the 787 Dreamliner and/or 747 jumbo aircraft relied on understated estimates of production costs; and (iii) as a result of the foregoing, Boeing's public statements were materially false and misleading at all relevant times.

53. On April 24, 2013, the Individual Defendants caused Boeing to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2013. For the quarter, Boeing reported net income of $1.11 billion, or $1.44 per diluted share, on revenue of $18.89 billion. The Form 10-Q stated in part:

**Commercial Aircraft Programs**

At March 31, 2013 and December 31, 2012, commercial aircraft programs inventory included the following amounts related to the 787 program: $24,358 and $21,289 of work in process (including deferred production costs of $17,095 and $15,929), $1,947 and $1,908 of supplier advances, and $2,508 and $2,339 of unamortized tooling and other non-recurring costs. At March 31, 2013, $14,525 of 787 deferred production costs, unamortized tooling and other non-recurring costs are expected to be recovered from units included in the program accounting quantity that have firm orders and $5,078 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

---

[4] The 2013 Proxy included Boeing's 2012 Annual Report, which included a copy of Boeing's 2012 Annual Report on Form 10-K.

At March 31, 2013 and December 31, 2012, commercial aircraft programs inventory the following amounts related to the 747 program: $1,312 and $1,292 of deferred production costs, net of previously recorded reach-forward losses, and $653 and $683 of unamortized tooling costs. At March 31, 2013, $1,046 of 747 deferred production costs and unamortized tooling are expected to be recovered from units included in the program accounting quantity that have firm orders and $919 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

54.     The Form 10-Q for the first quarter of 2013 contained signed certifications pursuant to SOX by defendants McNerney and Smith, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

55.     On July 24, 2013, the Individual Defendants caused Boeing to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2013. For the quarter, Boeing reported net income of $1.09 billion, or $1.41 per diluted share, on revenue of $21.82 billion. The Form 10-Q stated in part:

**Commercial Aircraft Programs**

At June 30, 2013 and December 31, 2012, commercial aircraft programs inventory included the following amounts related to the 787 program: $25,697 and $21,289 of work in process (including deferred production costs of $18,733 and $15,929), $1,977 and $1,908 of supplier advances, and $2,620 and $2,339 of unamortized tooling and other non-recurring costs. At June 30, 2013, $15,674 of 787 deferred production costs, unamortized tooling and other non-recurring costs are expected to be recovered from units included in the program accounting quantity that have firm orders and $5,679 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

At June 30, 2013 and December 31, 2012, commercial aircraft programs inventory included the following amounts related to the 747 program: $1,374 and $1,292 of deferred production costs, net of previously recorded reach-forward losses, and $627 and $683 of unamortized tooling costs. At June 30, 2013, $971 of 747 deferred production costs and unamortized tooling are expected to be recovered from units included in the program accounting quantity that have firm orders and $1,030 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

17

56. The Form 10-Q for the second quarter of 2013 contained signed certifications pursuant to SOX by defendants McNerney and Smith, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

57. On October 23, 2013, the Individual Defendants caused Boeing to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2013. For the quarter, Boeing reported net income of $1.16 billion, or $1.51 per diluted share, on revenue of $22.13 billion. The Form 10-Q stated in part:

**Commercial Aircraft Programs**

At September 30, 2013 and December 31, 2012, commercial aircraft programs inventory included the following amounts related to the 787 program: $26,453 and $21,289 of work in process (including deferred production costs of $20,189 and $15,929), $2,143 and $1,908 of supplier advances, and $2,862 and $2,339 of unamortized tooling and other non-recurring costs. At September 30, 2013, $14,657 of 787 deferred production costs, unamortized tooling and other non-recurring costs are expected to be recovered from units included in the program accounting quantity that have firm orders and $8,394 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

At September 30, 2013 and December 31, 2012, commercial aircraft programs inventory included the following amounts related to the 747 program: $1,237 and $1,292 of deferred production costs, net of previously recorded reach-forward losses, and $611 and $683 of unamortized tooling costs. At September 30, 2013, $859 of 747 deferred production costs and unamortized tooling are expected to be recovered from units included in the program accounting quantity that have firm orders and $989 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

58. The Form 10-Q for the third quarter of 2013 contained signed certifications pursuant to SOX by defendants McNerney and Smith, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

59.     In response to the third quarter 2013 results, which beat expectations and sent the Company's stock soaring to an all-time high of $131.19, an article on *The Motley Fool* website on October 28, 2013 noted that "[t]he biggest factor in Boeing's earnings beat was something that could best be described as an accounting trick."  The article went on to explain:

> Boeing uses an accounting technique called "program accounting" to measure costs for each airplane family.  When Boeing introduces a new model, it sells it for significantly less than the initial production cost.  However, production costs tend to drop fairly dramatically over time as Boeing and suppliers learn how to build the planes more efficiently.  Increases in the production rate also help reduce Boeing's costs.

> Program accounting smooths out these typical changes in profitability over time.  Rather than reporting losses on the first few hundred aircraft it sells and big profits on subsequent deliveries, Boeing estimates the total profit it will earn over the life of the program and then assigns a portion of that profit to each plane it sells.  These estimates depend heavily on how many airplanes Boeing plans to sell.

> **A new accounting block**

> During Q3, Boeing increased the accounting block for the 787 Dreamliner from 1,100 to 1,300, due in part to the launch of the larger 787-10 version back in June.  In other words, Boeing now assumes that it will sell 1,300 Dreamliners over the life of the program.

> By adding 200 planes to the end of the production block (when the 787 will be at its most profitable), Boeing increased its expectations for the program's total profit.  While development of the 787-10 also increased Boeing's costs, the net result was still an increase in the program's profit margin.  ***Under the rules of program accounting, some of that extra profit gets assigned to the 787s Boeing is currently delivering, allowing Boeing to report a higher profit margin***.

> **Trick or Treat?**

> ***Thus, while Boeing did post a good performance last quarter, the main reason it beat analysts' expectations was the addition of 200 planes to the Boeing 787 accounting block.* . . .**

60.     On February 14, 2014, the Individual Defendants caused Boeing to file an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2013.  For 2013, Boeing reported net income of

$4.59 billion, or $5.96 per diluted share, on revenue of $86.62 billion. The 2013 Form 10-K

stated in part:

### Program Accounting

Program accounting requires the demonstrated ability to reliably estimate the relationship of sales to costs for the defined program accounting quantity. A program consists of the estimated number of units (accounting quantity) of a product to be produced in a continuing, long-term production effort for delivery under existing and anticipated contracts. The determination of the accounting quantity is limited by the ability to make reasonably dependable estimates of the revenue and cost of existing and anticipated contracts. For each program, the amount reported as cost of sales is determined by applying the estimated cost of sales percentage for the total remaining program to the amount of sales recognized for airplanes delivered and accepted by the customer.

Factors that must be estimated include program accounting quantity, sales price, labor and employee benefit costs, material costs, procured part costs, major component costs, overhead costs, program tooling and other non-recurring costs, and routine warranty costs. . . .

***To ensure reliability in our estimates, we employ a rigorous estimating process that is reviewed and updated on a quarterly basis.*** Changes in estimates are normally recognized on a prospective basis; when estimated costs to complete a program exceed estimated revenues from undelivered units in the accounting quantity, a loss provision is recorded in the current period for the estimated loss on all undelivered units in the accounting quantity.

The program method of accounting allocates tooling and other non-recurring and production costs over the accounting quantity for each program. Because of the higher unit production costs experienced at the beginning of a new program and substantial investment required for initial tooling and other non-recurring costs, new commercial aircraft programs, such as the 787 program, typically have lower margins than established programs.

Due to the significance of judgment in the estimation process described above, it is likely that materially different cost of sales amounts could be recorded if we used different assumptions, or if the underlying circumstances were to change. Changes in underlying assumptions/estimates, supplier performance, or other circumstances may adversely or positively affect financial performance in future periods. If combined cost of sales percentages for commercial airplane programs for all of 2013 had been estimated to be lower by 1%, it would have increased pre-tax income for the year by approximately $460 million. If the combined cost of sales percentages for commercial airplane programs for all of 2013 (excluding the 747 and 787 programs which had gross margins that were breakeven or near breakeven during 2013) had been estimated to be higher by 1%, it would have decreased pretax income for the year by approximately $354 million. If we are

unable to mitigate risks associated with the 747 and 787 programs, or if we are required to change one or more of our pricing, cost or other assumptions related to these programs, we could be required to record reach forward losses which could have a material effect on our reported results.

61.     The 2013 Form 10-K contained signed certifications pursuant to SOX by defendants McNerney and Smith, stating that the financial information contained in the 2013 Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.  In addition to McNerney and Smith, the 2013 Form 10-K was signed by, among others, Director Defendants Calhoun, Collins, Duberstein, Giambastiani, Kellner, Liddy, Schwab, Williams, and Zafirovski.  Defendant Cook also signed the 2013 Form 10-K.

62.     On March 14, 2014, Boeing filed a Proxy Statement pursuant to Section 14(a) of the Exchange Act ("2014 Proxy").[5]  The 2014 Proxy described director responsibilities, the duties of each committee, Board risk management, and provided information about the director nominees up for election.  However, the 2014 Proxy misrepresented and/or failed to disclose that: (i) Boeing's use of program accounting for the Company's 787 Dreamliner and/or 747 jumbo aircraft relied on inflated sales forecasts; (ii) the Company's use of program accounting for the 787 Dreamliner and/or 747 jumbo aircraft relied on understated estimates of production costs; and (iii) as a result of the foregoing, Boeing's public statements were materially false and misleading at all relevant times.

63.     On April 23, 2014, the Individual Defendants caused Boeing to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2014.  For the quarter, Boeing reported net income of $965 million, or $1.28 per diluted share, on revenue of $20.47 billion.  The Form 10-Q stated in part:

---

[5]  The 2014 Proxy included Boeing's 2013 Annual Report, which included a copy of Boeing's 2013 Annual Report on Form 10-K.

**Commercial Aircraft Programs**

At March 31, 2014 and December 31, 2013, commercial aircraft programs inventory included the following amounts related to the 787 program: $30,246 and $27,576 of work in process (including deferred production costs of $23,123 and $21,620), $2,303 and $2,189 of supplier advances, and $3,453 and $3,377 of unamortized tooling and other non-recurring costs.  At March 31, 2014, $17,838 of 787 deferred production costs, unamortized tooling and other non-recurring costs are expected to be recovered from units included in the program accounting quantity that have firm orders and $8,737 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

At March 31, 2014 and December 31, 2013, commercial aircraft programs inventory included the following amounts related to the 747 program: $1,649 and $1,554 of deferred production costs, net of previously recorded reach-forward losses, and $552 and $563 of unamortized tooling costs.  At March 31, 2014, $1,189 of 747 deferred production costs and unamortized tooling are expected to be recovered from units included in the program accounting quantity that have firm orders and $1,012 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

64.     The Form 10-Q for the first quarter of 2014 contained signed certifications pursuant to SOX by defendants McNerney and Smith, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

65.     On July 23, 2014, the Individual Defendants caused Boeing to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2014.  For the quarter, Boeing reported net income of $1.65 billion, or $2.24 per diluted share, on revenue of $22.05 billion.  The Form 10-Q stated in part:

**Commercial Aircraft Programs**

At June 30, 2014 and December 31, 2013, commercial aircraft programs inventory included the following amounts related to the 787 program: $31,880 and $27,576 of work in process (including deferred production costs of $24,242 and $21,620), $2,320 and $2,189 of supplier advances, and $3,442 and $3,377 of unamortized tooling and other non-recurring costs.  At June 30, 2014, $18,367 of 787 deferred production costs, unamortized tooling and other non-recurring costs are expected to be recovered from units included in the program accounting quantity that have firm orders and $9,317 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

At June 30, 2014 and December 31, 2013, commercial aircraft programs inventory included the following amounts related to the 747 program: $1,756 and $1,554 of deferred production costs, net of previously recorded reach-forward losses, and $550 and $563 of unamortized tooling costs.  At June 30, 2014, $1,221 of 747 deferred production costs and unamortized tooling are expected to be recovered from units included in the program accounting quantity that have firm orders and $1,085 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

66.     The Form 10-Q for the second quarter of 2014 contained signed certifications pursuant to SOX by defendants McNerney and Smith, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

67.     On October 22, 2014, the Individual Defendants caused Boeing to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2014.  For the quarter, Boeing reported net income of $1.36 billion, or $1.86 per diluted share, on revenue of $23.78 billion.  The Form 10-Q stated in part:

**Commercial Aircraft Programs**

At September 30, 2014 and December 31, 2013, commercial aircraft programs inventory included the following amounts related to the 787 program: $32,744 and $27,576 of work in process (including deferred production costs of $25,189 and $21,620), $2,216 and $2,189 of supplier advances, and $3,565 and $3,377 of unamortized tooling and other non-recurring costs.  At September 30, 2014, $19,403 of 787 deferred production costs, unamortized tooling and other non-recurring costs are expected to be recovered from units included in the program accounting quantity that have firm orders and $9,351 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

At September 30, 2014 and December 31, 2013, commercial aircraft programs inventory included the following amounts related to the 747 program: $1,859 and $1,554 of deferred production costs, net of previously recorded reach-forward losses, and $518 and $563 of unamortized tooling costs.  At September 30, 2014, $1,113 of 747 deferred production and unamortized tooling costs are expected to be recovered from units included in the program accounting quantity that have firm orders and $1,264 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

68.     The Form 10-Q for the third quarter of 2014 contained signed certifications pursuant to SOX by defendants McNerney and Smith, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

69.     On February 12, 2015, the Individual Defendants caused Boeing to file an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2014.   For 2014, Boeing reported net income of $5.45 billion, or $7.38 per diluted share, on revenue of $90.76 billion.   The 2014 Form 10-K stated in part:

**Program Accounting**

Program accounting requires the demonstrated ability to reliably estimate the relationship of sales to costs for the defined program accounting quantity.   A program consists of the estimated number of units (accounting quantity) of a product to be produced in a continuing, long-term production effort for delivery under existing and anticipated contracts.   The determination of the accounting quantity is limited by the ability to make reasonably dependable estimates of the revenue and cost of existing and anticipated contracts.   For each program, the amount reported as cost of sales is determined by applying the estimated cost of sales percentage for the total remaining program to the amount of sales recognized for airplanes delivered and accepted by the customer.

Factors that must be estimated include program accounting quantity, sales price, labor and employee benefit costs, material costs, procured part costs, major component costs, overhead costs, program tooling and other non-recurring costs, and warranty costs. . . .

***To ensure reliability in our estimates, we employ a rigorous estimating process that is reviewed and updated on a quarterly basis.***   Changes in estimates are normally recognized on a prospective basis; when estimated costs to complete a program exceed estimated revenues from undelivered units in the accounting quantity, a loss provision is recorded in the current period for the estimated loss on all undelivered units in the accounting quantity.

The program method of accounting allocates tooling and other non-recurring and production costs over the accounting quantity for each program.   Because of the higher unit production costs experienced at the beginning of a new program and substantial investment required for initial tooling and other non-recurring costs,

new commercial aircraft programs, such as the 787 program, typically have lower margins than established programs.

Due to the significance of judgment in the estimation process described above, it is likely that materially different cost of sales amounts could be recorded if we used different assumptions, or if the underlying circumstances were to change. Changes in underlying assumptions/estimates, supplier performance, or other circumstances may adversely or positively affect financial performance in future periods. If combined cost of sales percentages for commercial airplane programs for all of 2014 had been estimated to be lower by 1%, it would have increased pre-tax income for the year by approximately $520 million. If the combined cost of sales percentages for commercial airplane programs for all of 2014 (excluding the 747 and 787 programs which had gross margins that were breakeven or near breakeven during 2014) had been estimated to be higher by 1%, it would have decreased pretax income for the year by approximately $360 million. If we are unable to mitigate risks associated with the 747 and 787 programs, or if we are required to change one or more of our pricing, cost or other assumptions related to these programs, we could be required to record reach-forward losses which could have a material effect on our reported results.

70.    The 2014 Form 10-K contained signed certifications pursuant to SOX by defendants McNerney and Smith, stating that the financial information contained in the 2014 Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting. In addition to McNerney and Smith, the 2014 Form 10-K was signed by, among others, Director Defendants Calhoun, Collins, Duberstein, Giambastiani, Kellner, Liddy, Schwab, Williams, and Zafirovski. Defendant Cook also signed the 2014 Form 10-K.

71.    On March 13, 2015, Boeing filed a Proxy Statement pursuant to Section 14(a) of the Exchange Act ("2015 Proxy").[6] The 2015 Proxy described director responsibilities, the duties of each committee, Board risk management, and provided information about the director nominees up for election. However, the 2015 Proxy misrepresented and/or failed to disclose that: (i) Boeing's use of program accounting for the Company's 787 Dreamliner and/or 747 jumbo aircraft relied on inflated sales forecasts; (ii) the Company's use of program accounting for the 787 Dreamliner and/or 747 jumbo aircraft relied on understated estimates of production

---

[6] The 2015 Proxy included Boeing's 2014 Annual Report, which included a copy of Boeing's 2014 Annual Report on Form 10-K.

costs; and (iii) as a result of the foregoing, Boeing's public statements were materially false and misleading at all relevant times.

72. On April 22, 2015, the Individual Defendants caused Boeing to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015. For the quarter, Boeing reported net income of $1.34 billion, or $1.87 per diluted share, on revenue of $22.15 billion. The Form 10-Q stated in part:

> At March 31, 2015 and December 31, 2014, commercial aircraft programs inventory included the following amounts related to the 787 program: $34,309 and $33,163 of work in process (including deferred production costs of $26,942 and $26,149), $2,369 and $2,257 of supplier advances, and $3,913 and $3,801 of unamortized tooling and other non-recurring costs. At March 31, 2015, $22,357 of 787 deferred production costs, unamortized tooling and other non-recurring costs are expected to be recovered from units included in the program accounting quantity that have firm orders and $8,498 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

> At March 31, 2015 and December 31, 2014, commercial aircraft programs inventory included the following amounts related to the 747 program: $1,715 and $1,741 of deferred production costs, net of previously recorded reach-forward losses, and $458 and $476 of unamortized tooling costs. At March 31, 2015, $1,054 of 747 deferred production and unamortized tooling costs are expected to be recovered from units included in the program accounting quantity that have firm orders and $1,119 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

73. The Form 10-Q for the first quarter of 2015 contained signed certifications pursuant to SOX by defendants McNerney and Smith, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

74. On June 23, 2015, the Individual Defendants caused the Company to file a Form 8-K with the SEC reporting that McNerney had decided to step down as CEO effective July 1, 2015. Pursuant to a Transition and Retirement Agreement, dated June 22, 2015 (the "McNerney Retirement Agreement"), McNerney would remain employed by the Company until February 29, 2016 in order to assist with the leadership transition to Muilenburg.

75.     In response to the news, an article in *Forbes* on June 24, 2015 reported that the announcement "was rather abrupt and the timing was unexpected. . . . there are certainly reasons to believe that he may have been nudged along in his move." The article went on to report:

> Under McNerney, Boeing's stock price did very well. Cash flow was generally strong, and investors like short-term metrics like these. But he also leaves behind a toxic legacy that future leadership will need to deal with.
>
> The company continues to lose tens of millions of dollars on each 787 it builds. These recurring production losses (on top of 787 development costs) stood at over $26 billion in January and will likely reach $30 billion, and possibly beyond.
>
> Boeing is using a 1,300 aircraft accounting block for the 787. Let's assume that 1,000 future 787s will bear this burden (that is, let's assume the company starts breaking even on each jet it builds just after it delivers its 300th Dreamliner). That means a $30 million tax on each of these 1,000 planes, in order to break even on the program.
>
> This terrible drag on profitability would have been partly avoided if Boeing management had taken a different approach to labor. Rather than the McNerney formula of eliminating pensions, cutting wages, and shifting production to new facilities, the company could have proposed a partnership with their workers.

76.     Despite the fact that McNerney had saddled the Company with this "terrible drag on profitability" in breach of his fiduciary duties, the other Individual Defendants rewarded him for his misconduct with a generous retirement package and allowed him to slowly make his departure. The McNerney Retirement Agreement provided that until the end of February 2016, McNerney will continue to be paid a salary of $1.5 million to perform services "at a level equal to 50% or more of the average level of service" that he provided prior to this time. Since the new CEO Muilenburg has been at Boeing since 1985, considerably longer than McNerney, and thus does not require substantial training or supervision, this amount of compensation to McNerney for "transition" services is excessive.

77.     The McNerney Retirement Agreement also provides for McNerney to receive accrued benefits at 50 percent of his highest average annual compensation, which sets the target

27

benefit as of December 31, 2014 at $3,184,500 per year. In addition, McNerney has additional retirement plans through the Company worth at least another $14 million.

78.     On July 22, 2015, the Individual Defendants caused Boeing to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2015. For the quarter, Boeing reported net income of $1.11 billion, or $1.59 per diluted share, on revenue of $24.54 billion. The Form 10-Q stated in part:

> At June 30, 2015 and December 31, 2014, commercial aircraft programs inventory included the following amounts related to the 787 program: $35,212 and $33,163 of work in process (including deferred production costs of $27,732 and $26,149), $2,294 and $2,257 of supplier advances, and $3,906 and $3,801 of unamortized tooling and other non-recurring costs. At June 30, 2015, $22,379 of 787 deferred production costs, unamortized tooling and other non-recurring costs are expected to be recovered from units included in the program accounting quantity that have firm orders and $9,259 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

> At June 30, 2015 and December 31, 2014, commercial aircraft programs inventory included the following amounts related to the 747 program: $1,787 and $1,741 of deferred production costs, net of previously recorded reach-forward losses, and $426 and $476 of unamortized tooling costs. At June 30, 2015, $1,019 of 747 deferred production and unamortized tooling costs are expected to be recovered from units included in the program accounting quantity that have firm orders and $1,194 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

79.     The Form 10-Q for the second quarter of 2015 contained signed certifications pursuant to SOX by defendants McNerney and Smith, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

80.     On October 21, 2015, the Individual Defendants caused Boeing to file a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2015. For the quarter, Boeing reported net income of $1.7 billion, or $2.47 per diluted share, on revenue of $25.85 billion. The Form 10-Q stated in part:

At September 30, 2015 and December 31, 2014, commercial aircraft programs inventory included the following amounts related to the 787 program: $35,282 and $33,163 of work in process (including deferred production costs of $28,309 and $26,149), $2,267 and $2,257 of supplier advances, and $3,908 and $3,801 of unamortized tooling and other non-recurring costs. At September 30, 2015, $22,496 of 787 deferred production costs, unamortized tooling and other non-recurring costs are expected to be recovered from units included in the program accounting quantity that have firm orders and $9,721 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

At September 30, 2015 and December 31, 2014, commercial aircraft programs inventory included the following amounts related to the 747 program: $1,891 and $1,741 of deferred production costs, net of previously recorded reach-forward losses, and $405 and $476 of unamortized tooling costs. At September 30, 2015, $739 of 747 deferred production and unamortized tooling costs are expected to be recovered from units included in the program accounting quantity that have firm orders and $1,557 is expected to be recovered from units included in the program accounting quantity that represent expected future orders.

81. The Form 10-Q for the third quarter of 2015 contained signed certifications pursuant to SOX by defendants McNerney and Smith, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

82. On February 10, 2016, the Individual Defendants caused Boeing to file an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2015. For 2015, Boeing reported net income of $5.18 billion, or $7.44 per diluted share, on revenue of $96.11 billion. The 2015 Form 10-K stated in part:

**Program Accounting**

Program accounting requires the demonstrated ability to reliably estimate the relationship of sales to costs for the defined program accounting quantity. A program consists of the estimated number of units (accounting quantity) of a product to be produced in a continuing, long-term production effort for delivery under existing and anticipated contracts. The determination of the accounting quantity is limited by the ability to make reasonably dependable estimates of the revenue and cost of existing and anticipated contracts. For each program, the amount reported as cost of sales is determined by applying the estimated cost of

29

sales percentage for the total remaining program to the amount of sales recognized for airplanes delivered and accepted by the customer.

Factors that must be estimated include program accounting quantity, sales price, labor and employee benefit costs, material costs, procured part costs, major component costs, overhead costs, program tooling and other non-recurring costs, and warranty costs. . . .

***To ensure reliability in our estimates, we employ a rigorous estimating process that is reviewed and updated on a quarterly basis.*** Changes in estimates are normally recognized on a prospective basis; when estimated costs to complete a program exceed estimated revenues from undelivered units in the accounting quantity, a loss provision is recorded in the current period for the estimated loss on all undelivered units in the accounting quantity.

The program method of accounting allocates tooling and other non-recurring and production costs over the accounting quantity for each program. Because of the higher unit production costs experienced at the beginning of a new program and substantial investment required for initial tooling and other non-recurring costs, new commercial aircraft programs, such as the 787 program, typically have lower initial margins than established programs. In addition, actual costs incurred for earlier units in excess of the estimated average cost of all units in the program accounting quantity are included within program inventory as deferred production costs. Deferred production, unamortized tooling and other non-recurring costs are expected to be fully recovered when all units in the accounting quantity are delivered as the expected unit cost for later deliveries is below the estimated average cost as learning curve and other improvements are realized.

Due to the significance of judgment in the estimation process described above, it is reasonably possible that changes in underlying circumstances or assumptions could have a material effect on program gross margins. If the combined gross margin percentages for our commercial airplane programs had been estimated to be 1% higher or lower it would have a similar effect on the Commercial Airplane segment's operating margins. For the year-ended December 31, 2015, a 1% increase or decrease in operating margins for our Commercial Airplane segment would have a $650 million impact on operating earnings.

The 747 is in a reach-forward loss position at December 31, 2015 while the 787 program had near breakeven margins during 2015. Absent changes in estimated revenues or costs, subsequent 747 deliveries are recorded at zero margin. Reductions to the estimated loss in subsequent periods are spread over all undelivered units in the accounting quantity, whereas increases to the estimated loss are recorded immediately as an additional reach-forward loss. If we are unable to mitigate risks associated with the 747 and 787 programs, or if we are required to change one or more of our pricing, cost or other assumptions related to these programs, we could be required to record additional reach-forward losses which could have a material effect on our reported results.

83.     The 2015 Form 10-K contained signed certifications pursuant to SOX by defendants Muilenburg and Smith, stating that the financial information contained in the 2015 Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.  In addition to Muilenburg and Smith, the 2015 Form 10-K was signed by, among others, Director Defendants Calhoun, Collins, Duberstein, Giambastiani, Good, Kellner, Liddy, Schwab, Williams, and Zafirovski.  Defendant McNerney also signed the 2015 Form 10-K.

84.     During the Relevant Period, due to the misstatements and omissions by the Individual Defendants, the stock price rose to record highs, reaching a closing price of $158.31 on February 20, 2015.

## REASONS STATEMENTS WERE IMPROPER

85.     The true facts, which were known or recklessly disregarded by the Individual Defendants, but were concealed from the investing public, were as follows:

(a)     Boeing's use of program accounting for the Company's 787 Dreamliner and/or 747 jumbo aircraft relied on inflated sales forecasts;

(b)     Boeing's use of program accounting for the Company's 787 Dreamliner and/or 747 jumbo aircraft relied on understated estimates of production costs; and

(c)     As a result of the foregoing, the Company's touted financial and business prospects were materially false and misleading at all relevant times.

86.     As a result of the Individual Defendants' false and misleading statements and omissions, Boeing shares traded at artificially inflated prices during the Relevant Period.  Once the true facts regarding the Company's financial prospects and future business prospects began to emerge, on news of the SEC's investigation into Boeing, investors sold Boeing stock, causing

the Company's stock price to fall $7.92 per share to close at $108.44 per share on February 11, 2016, erasing hundreds of millions of dollars in market capitalization.

**THE TRUTH BEGINS TO EMERGE**

87.     On January 27, 2016, the Individual Defendants caused Boeing to issue a press release announcing the Company's financial and operating results for the quarter ended December 31, 2015.  For the quarter, Boeing reported net income of $1.03 billion, or $1.51 per diluted share, on revenue of $23.57 billion.

88.     Although the Company beat analyst expectations for fourth quarter earnings, the Individual Defendants caused Boeing to issue full-year guidance that was below prior expectations.  On this news, shares dropped $11.33 in one day, a loss of 8.9% and the largest one-day price drop in the Company's 44-year history as a public company.

89.     On February 11, 2016, *Bloomberg News* reported that the SEC was investigating whether Boeing properly accounted for the costs and expected sales of the Company's 787 Dreamliner and 747 jumbo aircraft.  According to the article:

> Underlying the SEC review is a financial reporting method known as program accounting that allows Boeing to spread the enormous upfront costs of manufacturing planes over many years.  While the SEC has broadly blessed its use in the aerospace industry, critics have said the system can give too much leeway to smooth earnings and obscure potential losses. . . .
>
> As part of the investigation, SEC enforcement attorneys are examining whether Boeing's financial statements relied on sales forecasts that might be too optimistic, one person said.  Another avenue of inquiry is whether Boeing's estimates for declining production costs will come to fruition, the person said.
>
> A whistleblower has given SEC officials internal documents and data about Boeing's accounting, according to the people.  The tipster first raised concerns with the regulator more than a year ago, one person said.  SEC policy is not to reveal the identities of the whistleblowers.

90.     On this news, Boeing's stock plummeted $7.92 per share to close at $108.44 per share on February 11, 2016, its lowest closing price in more than two years, erasing hundreds of

millions of dollars in market capitalization. This price drop—just two weeks after the previous record plunge—was the second-biggest price drop in the stock's history, and left the stock with a loss of approximately 25% for the year 2016.

### INSIDER SELLING

91. Not all stockholders were harmed by the Individual Defendants' actions.

92. Indeed, during the relevant period, while in possession of material, adverse, non-public information, certain of the Individual Defendants unloaded their holdings of Boeing stock at bloated prices. Specifically, in 2014 and 2015 alone, the Insider Selling Defendants (including Director Defendants Muilenburg and Duberstein) took advantage of the artificially inflated prices to sell their Boeing shares for substantial proceeds. As detailed below, these Insider Selling Defendants sold *more than $28 million* of personally held common stock.

93. Defendant McNerney was a member of the Company's Board, as well as the Company's CEO and Chairman of the Board, during the Relevant Period. McNerney was aware of material, non-public information regarding the Company's use of program accounting for the Company's 787 Dreamliner and/or 747 jumbo aircraft, and the inaccuracy of Boeing's disclosures in the Company's press releases and public filings. While in possession of this information, McNerney sold at least 307,227 personally held shares of Boeing stock at artificially inflated prices for proceeds of more than *$43 million*. McNerney's sales were timed to maximize profits from the Company's then artificially inflated stock price, including the following sales:

    (a)    On February 27, 2015, McNerney sold 23,277 shares at $151.17 per share, generating personal proceeds of approximately $3.52 million.

    (b)    On March 6, 2015, McNerney sold 143 shares at $153.92 per share, generating proceeds of approximately $22,000.

(c)     On August 7, 2015, McNerney sold 261,000 shares at $142.23 per share, generating proceeds of approximately $37.12 million.

(d)     On February 25, 2016, McNerney sold 22,807 shares at $116.69 per share, generating proceeds of approximately $2.66 million.

94.     Defendant Muilenburg is a member of the Company's Board, as well as the Company's CEO and Chairman of the Board.  During the Relevant Period, Muilenburg was aware of material, non-public information regarding the Company's use of program accounting for the Company's 787 Dreamliner and/or 747 jumbo aircraft, and the inaccuracy of Boeing's disclosures in the Company's press releases and public filings.  While in possession of this information, Muilenburg sold at least 40,659 personally held shares of Boeing stock at artificially inflated prices for proceeds of approximately ***$5.74 million***.  Muilenburg's sales were timed to maximize profits from the Company's then artificially inflated stock price, including the following sales:

(a)     On February 2, 2015, Muilenburg sold 27,998 shares at $144.38 per share, generating personal proceeds of approximately $4.04 million.

(b)     During that same month, on February 27, 2015, Muilenburg sold another 6,480 shares at $151.17 per share, generating proceeds of approximately $980,000.

(c)     On March 6, 2015, Muilenburg sold 39 shares at $153.92 per share, generating proceeds of approximately $6,000.

(d)     On February 25, 2016, Muilenburg sold 6,142 shares at $116.69 per share, generating proceeds of approximately $717,000.

95.     Defendant Smith is the Company's CFO.  During the Relevant Period, Smith was aware of material, non-public information regarding the Company's use of program accounting

for the Company's 787 Dreamliner and/or 747 jumbo aircraft, and the inaccuracy of Boeing's disclosures in the Company's press releases and public filings. While in possession of this information, Smith sold at least 9,589 personally held shares of Boeing stock at artificially inflated prices for proceeds of more than *$1.2 million*. Smith's sales were timed to maximize profits from the Company's then artificially inflated stock price, including the following sales:

    (a)    On February 5, 2014, Smith sold 3,911 shares at $120.72 per share, generating personal proceeds of approximately $472,000.

    (b)    On February 27, 2015, Smith sold 2,968 shares at $151.17 per share, generating proceeds of approximately $449,000.

    (c)    On March 6, 2015, Smith sold 24 shares at $153.92 per share, generating proceeds of approximately $3,700.

    (d)    On February 25, 2016, 2,686 shares at $116.69 per share, generating proceeds of approximately $313,000.

96.    Defendant Duberstein is a member of the Company's Board. During the Relevant Period, Duberstein was aware of material, non-public information regarding the Company's use of program accounting for the Company's 787 Dreamliner and/or 747 jumbo aircraft, and the inaccuracy of Boeing's disclosures in the Company's press releases and public filings. While in possession of this information, on May 2, 2014, Duberstein sold at least 2,400 personally held shares of Boeing stock at artificially inflated prices (approximately $130.00 per share) for proceeds of approximately $312,000. Duberstein's sales were timed to maximize profits from the Company's then artificially inflated stock price.

97.    These insider sales were executed under highly suspicious circumstances and occurred while the Company's stock price was artificially inflated due to the misrepresentations and omissions alleged herein.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

98.     By reason of their positions as officers, directors, and/or fiduciaries of Boeing and because of their ability to control the business and corporate affairs of Boeing, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Boeing in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Boeing and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

99.     Each director and officer of the Company owes to Boeing and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

100.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Audit Committee Duties**

101.     In addition to these duties, the members of the Audit Committee owed specific duties to Boeing under the Audit Committee's Charter to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

102.     Specifically, according to Boeing's Audit Committee Charter, the Audit Committee's responsibilities include the following:

- Appoint, retain, compensate, evaluate, and terminate, if necessary the independent auditor, which auditor will report directly to the Committee. The Committee shall present its conclusions with respect to the independent auditor to the Board.

- Review and pre-approve both audit and non-audit services to be provided by the independent auditor.

- Review and advise on the selection and removal of the VP-Corporate Audit. Additionally, the Committee will review, recommend changes to, and approve the Internal Audit Charter.

- Obtain and review, on an annual basis, a formal written report prepared by the independent auditor describing:

    o The firm's internal quality-control procedures;

    o Any material issues raised by the most recent internal quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with such issues; and

    o All relationships between the independent auditor and the Company (for purposes of assessing the auditor's independence), including discussion and evaluation of such relationships, and recommending that the Board take appropriate action in response to the independent auditor's report to satisfy itself of the independent auditor's independence.

- Discuss with the independent auditor any difficulties or problems encountered in performing the audit, including management's response, as well as any significant disagreements between management and the independent auditor.

- Review with the independent auditors, internal auditors, and members of senior management the adequacy and effectiveness of the Company's financial controls and financial reporting processes.

- Meet periodically with management, the VP-Corporate Audit, and the independent auditors in separate executive sessions.

- Review the Company's internal audit plan, including the responsibilities, budget, and staffing of the Company's internal audit function, and receive regular reporting from the VP-Corporate Audit on audit activities and trends.

- Meet to review and discuss with management and the independent auditors, prior to filing, the Company's quarterly and annual reports filed with the SEC on Forms 10-Q and l0-K, including the Management's Discussion and Analysis of Financial Condition and Results of Operations, any management certifications as required

37

by the Sarbanes-Oxley Act of 2002 and relevant reports rendered by the independent auditors.

- Review and discuss earnings press releases with management as well as financial information and earnings guidance provided to analysts and rating agencies. Discussions of earnings press releases as well as financial information and earnings guidance may be done generally (i.e., discussion of the types of information to be disclosed and the type of presentation to be made). Discussions need not occur in advance of each earnings press release or each instance in which earnings guidance is provided.

- Review this charter on an annual basis and recommend to the Board changes to the charter as appropriate to support an affirmation by the Board.

- Discuss with management the Company's policies, practices and guidelines with respect to risk assessment and risk management.

- At least annually receive reporting by the SVP-OIG on the Company's compliance with its risk management processes, and by the General Counsel on pending Law Department investigations of alleged or potentially significant violations of laws, regulations, or Company policies.

- Review management's assessment of compliance with laws, regulations, and Company policies relative to payments to individuals or organizations retained as foreign sales consultants.

- Meet with the SVP-OIG to review the Company's ethics and business conduct programs and the Company's compliance with related laws and regulations.

- Review significant pending and threatened litigation, the status of advancement of expenses to employees involved in company-related legal proceedings, and related indemnification.

- Set clear hiring policies, compliant with governing laws or regulations, for the Company's hiring of employees or former employees of the independent auditor.

- Establish and maintain procedures for:

  o The receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and

  o The confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

- Perform an annual performance evaluation of the Committee.

- Report regularly to the Board regarding the execution of the Committee's duties and responsibilities as well as any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors, or the performance of the internal audit function.

- Report regularly to the Board with respect to the implementation and effectiveness of the Company's ethics and compliance programs to support the Board's oversight responsibility.

- Periodically review risk assessments from management with respect to cyber security, including assessments of the overall threat landscape and related strategies and investments.

- Periodically assess the adequacy and need for additional continuing director education programs relevant to the Committee's responsibilities.

- Perform such other duties as may be delegated from time to time by the Board.

103.    Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

**Duties Pursuant to the Company's Code of Conduct and Ethics**

104.    Additionally, the Individual Defendants, as officers and/or directors of Boeing, are bound by the Company's Ethical Business Conduct Guidelines and/or the Company's Code of Ethical Business Conduct (the "Code") which, according to the Code, was adopted to "help to continue to foster and sustain a culture of honesty and accountability," among other things.  Each director "must comply with the letter and spirit" of the Code.

105.    In addition, the Board is bound by the Company's Corporate Governance Principles (the "Principles"), which were adopted to assist the Board in exercising its responsibilities.

106.    According to the Principles, the Board's oversight responsibilities include:

(1) evaluating the CEO's performance and reviewing the Company's succession plan for the CEO and senior management; (2) reviewing the long-range business

plans of the Company and monitoring performance relative to achievement of those plans; (3) considering long-range strategic issues and risks facing the Company; and (4) approving policies of corporate conduct that continue to promote and maintain the integrity of the Company. In addition, the Board shall be knowledgeable about the content and operation of Boeing's ethics and compliance program, and shall exercise oversight with respect to the program's implementation and effectiveness.

107.    Upon information and belief, the Company maintained a version of the Code and the Principles during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Board as those set forth above.

**Control, Access, and Authority**

108.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Boeing, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Boeing.

109.    Because of their advisory, executive, managerial, and directorial positions with Boeing, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Boeing.

110.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Boeing, and was at all times acting within the course and scope of such agency.

**Reasonable And Prudent Supervision**

111.    To discharge their duties, the officers and directors of Boeing were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Boeing were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d)     remain informed as to how Boeing conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)     ensure that Boeing was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

112.   Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Boeing and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Boeing, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their

obligations as directors and officers of Boeing, the absence of good faith on their part, and a reckless disregard for their duties to Boeing and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Boeing.

113. The Individual Defendants each breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

114. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of the federal securities laws. As a result, Boeing has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

115. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

116. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

117. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust

enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

118.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

119.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO BOEING

120.    As a result of the Individual Defendants' wrongful conduct, Boeing disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated Boeing's credibility.  Boeing has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

121.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Boeing's market capitalization has been substantially damaged, losing hundreds of millions of dollars in value as a result of the conduct described herein.

122.    Further, as a direct and proximate result of the Individual Defendants' conduct, Boeing has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred in investigating and defending Boeing and certain officers in the pending Securities Class Action, plus potentially millions of dollars in settlement or to satisfy an adverse judgment;

(b)    costs incurred by the Company in connection with the SEC investigation into its accounting practices;

(c)    costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on Boeing's artificially-inflated stock price; and

(d)    costs incurred from the loss of the Company's customers' confidence in Boeing's products.

123.    Moreover, these actions have irreparably damaged Boeing's corporate image and goodwill.  For at least the foreseeable future, Boeing will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Boeing's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

124.    Plaintiff brings this action derivatively in the right and for the benefit of Boeing to redress injuries suffered, and to be suffered, by Boeing as a direct result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Boeing is named as a nominal defendant solely in a derivative capacity.

125.    Plaintiff will adequately and fairly represent the interests of Boeing in enforcing and prosecuting its rights.

126.    Plaintiff was a shareholder of Boeing common stock at the time of the wrongdoing of which Plaintiff complains, and has been continuously since.

127.    Plaintiff did not make a pre-suit demand on the Board to pursue this action because such a demand would have been a futile and wasteful act.

128.    At the time this action was commenced, the Board of Boeing consisted of the following twelve (12) directors: Muilenburg, Calhoun, Collins, Duberstein, Giambastiani, Good, Kellner, Liddy, Schwab, Williams, Zafirovski, and non-defendant Stephenson.  A majority of these individuals are not disinterested and independent with respect to the acts and omissions alleged herein.  Moreover, each faces a substantial likelihood of personal liability for their breaches of the duties of trust, loyalty, good faith, candor, oversight, reasonable inquiry, supervision, and due care described herein.

**Demand is Futile as to All Director Defendants Because the Director Defendants Face a Substantial Likelihood of Liability**

129.    The Director Defendants face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its financial and business prospects were accurate.

130.    Indeed, Director Defendants Calhoun, Collins, Duberstein, Giambastiani, Kellner, Liddy, Schwab, Williams, and Zafirovski each signed the false and misleading 2011, 2012, 2013, and 2014 Form 10-Ks, while Muilenburg and Good, in addition to each of Calhoun, Collins, Duberstein, Giambastiani, Kellner, Liddy, Schwab, Williams, and Zafirovski, signed the false and misleading 2015 Form 10-K.  The 2011-2015 Form 10-Ks were each false and misleading

because, *inter alia*, they misrepresented and/or failed to disclose that: (i) Boeing's use of program accounting for the Company's 787 Dreamliner and/or 747 jumbo aircraft relied on inflated sales forecasts; and (ii) the Company's use of program accounting for the 787 Dreamliner and/or 747 jumbo aircraft relied on understated estimates of production costs. As such, the 2011-2015 Form 10-Ks were each false and/or misleading. As a result, Muilenburg, Good, Calhoun, Collins, Duberstein, Giambastiani, Kellner, Liddy, Schwab, Williams, and Zafirovski (i.e., all but one member of the current Board) face a substantial likelihood of liability for their breaches of fiduciary duties, rendering demand upon them futile.

131. Moreover, the Director Defendants as directors (and, in some cases, also as Audit Committee members) owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls and/or internal auditing and accounting controls over financial reporting were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and/or with reckless disregard reviewed, authorized and/or caused the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.

132. The Director Defendants also wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's executive officers and directors. The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

133.   The Director Defendants' making or authorization of false and misleading statements throughout the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of Boeing to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile.

**Demand is Futile as to the Audit Committee Defendants**

134.   The Audit Committee Defendants were responsible for, among other things, reviewing and approving quarterly and annual financial statements and earnings press releases, overseeing Boeing's internal controls over financial reporting, and discharging their other duties described herein.  Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of false and/or materially misleading earnings press releases and earnings guidance, and failed in their specific duties to ensure that the Company's internal controls over financial reporting were sufficient and that statements made by the Company regarding its business and financial prospects were accurate.  Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon the Audit Committee Defendants therefore is futile.

47

**Demand is Futile as to Defendant Muilenburg for Additional Reasons**

135.    In addition to the reasons discussed herein as to why demand is futile as to all Director Defendants, demand is futile as to Muilenburg because Muilenburg is not an independent director.

136.    Muilenburg also cannot disinterestedly consider a demand to bring suit against himself because Muilenburg is a named defendant in the Securities Class Action, which alleges that he made many of the same misstatements described above in violation of the federal securities laws.  Thus, if Muilenburg were to initiate suit in this action, he would compromise his ability to simultaneously defend himself in the Securities Class Action and would expose himself to liability in this action.  This he will not do.

137.    Demand is futile for the additional reason that Muilenburg is an employee of the Company who derives substantially all of his income from his employment with (and depends for his livelihood on) Boeing, making him, as acknowledged by the Company in its most recent Proxy Statement filed on March 13, 2015, not independent.   As such, Muilenburg cannot independently consider any demand to sue himself for breaching his fiduciary duties to Boeing because that would expose him to liability and threaten his livelihood.

**Demand is Futile For Additional Reasons**

138.    Boeing's Board has already demonstrated that it cannot independently and disinterestedly consider a pre-suit demand to bring the claims set forth herein.  Despite the wrongdoing of McNerney, the Board has seen fit to bestow *benefits* for his departure from the Company, including a substantial severance package.

139.    Further, demand is futile as to Calhoun and Zafirovski due to their significant business ties with McNerney while at General Electric Company ("GE"), creating a conflict of interest that makes Calhoun and Zafirovski unable to independently consider any demand.

Calhoun was formerly the Vice Chairman of GE and the Chief Executive Officer of GE Infrastructure, and ran multiple business units at GE for 26 years. Zafirovski was also in management positions at GE for 25 years, including 13 years as President and Chief Executive Officer of five businesses in the consumer, industrial, and financial services arenas. During that time, McNerney also worked in management positions at GE, including as President and Chief Executive Officer of GE Aircraft Engines from 1997 to 2000.

140. Demand is futile as to Liddy due to his significant business ties with McNerney while at 3M Company, creating a conflict of interest that makes Liddy unable to independently consider any demand. Liddy has been a director of 3M Company since 2000, including serving as chair of the audit committee, and McNerney was the Chairman and CEO of 3M Company from January 2001 to June 2005.

141. Demand is futile as to Williams and Liddy because they serve as a director of a total of four public companies: besides Boeing, Williams sits on the Board of American Express Company, Envision Healthcare Holdings, Inc., and Johnson & Johnson; Liddy sits on the Board of 3M Company, Abbott Laboratories, and AbbVie Inc. Together with their other professional commitments, these Director Defendants' serial Board membership precludes them from devoting adequate attention to the integrity of Boeing's operations, compliance, and public disclosures, and subjects them to a substantial likelihood of liability for the claims set forth herein.

**Demand is Futile Based on Insider Selling**

142. Demand is futile as to Duberstein and Muilenburg because, as alleged herein, each engaged in insider trading activity at a time when each of them knew of adverse, material, non-public information about the Company's financial outlook that was not being disclosed to the shareholders.

143.    On the basis of this non-public information, Duberstein and Muilenburg timed their sales to maximize profit from Boeing's then artificially inflated stock price.

144.    As a result of these illicit insider sales, defendants Duberstein and Muilenburg each received direct financial benefits not shared with Boeing shareholders, and are, therefore, each directly interested in a demand.  Further, defendants Duberstein and Muilenburg each are interested in a demand because they face a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith based on their challenged insider sales.  As such, demand upon Duberstein and Muilenburg is futile.

**Demand is Futile as to All Directors for Additional Reasons**

145.    Each of the Director Defendants receives a lavish annual retainer of approximately $300,000 purely for being a Board member.  This compensation provides a substantial stipend to these directors, from which each of them personally benefits, depending for his or her livelihood in substantial part on Boeing.  Demand on each of the Director Defendants is futile because, through their course of conduct to date, they have demonstrated their unwillingness to undertake any action that would threaten the economic benefits they receive as members of Boeing's Board.

146.    If Boeing's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders.  However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Boeing against the Individual Defendants, known as the "insured versus insured exclusion."

50

147. As a result, if the Director Defendants were to sue themselves or certain of the officers of Boeing, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

148. Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting Boeing by prosecuting this action. Therefore, demand on Boeing and its Board is futile and is excused.

149. Boeing has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing. Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct. Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

150. Plaintiff has not made any demand on shareholders of Boeing to institute this action since such demand would be a futile and useless act for the following reasons:

(a) Boeing is a publicly traded company with thousands of shareholders of record and at least hundreds of thousands of beneficial owners;

(b) Making demand on such a number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of Boeing shareholders; and

(c)     Making demand on all shareholders would force Plaintiff to incur excessive expenses and obstacles, assuming all shareholders could even be individually identified  with any degree of certainty.

## COUNT I

### Against the Individual Defendants for Violations of Section 14(a) of The Securities Exchange Act of 1934

151.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

152.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

153.    The Company's 2012, 2013, 2014, and 2015 Proxy Statements violated Section 14(a) and Rule 14a-9 by misrepresenting or failing to disclose that: (i) Boeing's use of program accounting for the Company's 787 Dreamliner and/or 747 jumbo aircraft relied on inflated sales forecasts; (ii) the Company's use of program accounting for the 787 Dreamliner and/or 747 jumbo aircraft relied on understated estimates of production costs; and (iii) as a result of the foregoing, Boeing's public statements were materially false and misleading at all relevant times.

154.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose these material facts, the statements contained in these Proxy Statements were materially false and misleading.  The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder

determination in the Proxy Statements, including but not limited to, election of directors, approval of officer compensation, and appointment of independent auditor.

155. The Company was damaged as a result of defendants' material misrepresentations and omissions in the Proxy Statements.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duties

156. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

157. The Individual Defendants owed and owe Boeing fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Boeing the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

158. The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

159. The Individual Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

160. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Boeing has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

161. Plaintiff, on behalf of Boeing, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

162.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

163.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Boeing.

164.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Boeing.

165.    Plaintiff, as a shareholder and representative of Boeing, seeks restitution from defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by defendants from their wrongful conduct and fiduciary breaches.

166.    Plaintiff, on behalf of Boeing, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

167.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

168.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and on-going harm to the Company.

169.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) by paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

170.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

171.     Plaintiff, on behalf of Boeing, has no adequate remedy at law.

### COUNT V

**Against the Insider Selling Defendants for Breach of Fiduciary Duty
for Insider Selling and Misappropriation of Information**

172.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

173.     At the time the Insider Selling Defendants sold their Boeing stock, they knew the information described above, and sold Boeing stock on the basis of such information.

174.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.   It was a proprietary asset belonging to the Company, which the Insider Selling Defendants misappropriated to their own benefit when they sold Boeing stock.

175.     The Insider Selling Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

176.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

177.     Plaintiff, on behalf of Boeing, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all defendants for the amount of damages sustained by the Company as a result of defendants' violations of federal law, breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and insider selling;

B.      Directing Boeing to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Boeing and its shareholders from a repeat of the damaging events described herein, including but not limited to putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of Boeing's directors, executives and other employees;

- a proposal to require an independent Chairman of the Board;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test and then strengthen the Company's internal operational control functions;

C.      Awarding to Boeing restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  March 24, 2016

                                Respectfully submitted,


                                */s/Lori A. Fanning*
                                LORI A. FANNING

                                **MILLER LAW LLC**
                                115 S. LaSalle Street, Suite 2910
                                Chicago, IL 60603
                                Telephone: (312) 332-3400
                                Email: lfanning@millerlawllc.com

                                **JOHNSON & WEAVER, LLP**
                                Frank J. Johnson
                                600 West Broadway, Suite 1540
                                San Diego, CA 92101
                                Telephone: (619) 230-0063
                                Facsimile: (619) 255-1856
                                Email: frankj@johnsonandweaver.com

                                **JOHNSON & WEAVER, LLP**
                                Michael I. Fistel, Jr.
                                Albert M. Myers
                                40 Powder Springs Street
                                Marietta, GA 30064
                                Telephone: (770) 200-3104
                                Facsimile: (770) 200-3101
                                Email: michaelf@johnsonandweaver.com
                                        alm@johnsonandweaver.com


                                ***Attorneys for Plaintiff***